## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONWIDE MUTUAL FIRE
INSURANCE CO.
    *Plaintiff*

**VS.**

FRANCIS MALOFIY
    *Defendant*

**CIVIL ACTION NO.:  10-CV-2410**

*JURY TRIAL DEMANDED*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT FRANCIS MALOFIY'S RESPONSE IN OPPOSITION TO
## PLAINTIFF NATIONWIDE'S JUDGMENT ON THE PLEADINGS

Francis Malofiy, by his undersigned counsel, hereby submits this following
Memorandum of Law in support of his Response in Opposition to Plaintiff Nationwide's
Judgment on the Pleadings and in support thereof avers as follows:


## I.    MATTER BEFORE THE COURT

Before the court are Plaintiff Nationwide's Motion for Judgment on the Pleadings;  and
Defendant Francis Malofiy's Response in Opposition to Plaintiff Nationwide's Motion for
Judgment on the Pleadings.

Plaintiff Nationwide Mutual Fire Insurance Company ("Nationwide") insured defendant
Francis Malofiy ("Malofiy") with a Homeowner's Insurance Policy, policy number 58 37 MP
187088.  Pursuant to that policy, Nationwide is obligated to provide a defense for and coverage
for Malofiy for bodily injury caused by an occurrence which takes place in the coverage territory
during the policy period.  On August 16, 2008, a confrontation, the details of which will be
further elaborated upon, took place between Malofiy and defendant Dante Troiani ("Troiani"
"Underlying Plaintiff") and his friends at the a 2204 Liberty Bar ("Liberty Bar").  As a result of
this incident criminal charges were brought against Malofiy for striking Troiani.  Malofiy was
subsequently found *Not Guilty* and that his actions were a justifiable use of force in self-defense
("Underlying Criminal Action").  Also, as result of this incident, Troiani instituted civil action
against Malofiy and Liberty Bar in the Court of Common Pleas of Philadelphia County, February
Term, 2009, No.:  001162 ("Troiani v. Malofiy" "Underlying Action" "Underlying Complaint").
Furthermore, as a result of this incident, Malofiy also instituted civil action against Troiani and
his friends, and Liberty Bar in the same court;  however, this is not relevant in the instant
Declaratory Action before this Court.

## II.   STATEMENT OF QUESTIONS INVOLVED

1.   Does Pennsylvania law require that the insurer, Nationwide, has a duty to defend the insured, Francis Malofiy, when the factual allegations in the Underlying Complaint on their face state a claim against the insured to which the policy *potentially* applies?

> **Suggested Answer:**  Yes.
> Pennsylvania law requires that if the factual allegations in the Underlying Complaint on their face state a claim against the insured to which the policy *potentially* applies, the insurer *must* defend.

2.   Is the insurance policy exclusion 1a applicable which removes coverage for bodily injury caused by an act intending to cause harm done at the direction of any insured, *when the defendant's act was in self-defense intended for protection against another's unlawful use of force?*

> **Suggested Answer:**  No.
> As a matter of law, self-defense is *not* an act intended to cause harm, but rather is an act intending to protect oneself from another's unlawful use of force.

3.   Is the insurance policy exclusion 1b applicable which removes coverage for bodily injury caused by an act that is criminal in nature, *when the defendant was tried and found not guilty on all charges and where the jury found his actions to be justified and in self-defense?*

> **Suggested Answer:**  No (emphasis added).
> Criminal by its very definition means one who has committed a criminal offense;  one who has been convicted of a crime;  or having the character of a crime.  When a defendant's use of force is justified in self-protection and when he is found not guilty of the crimes charged, it means that he is innocent and has committed no crime, and therefore his conduct cannot be deemed to be, or characterized as "criminal in nature."  To read or find any other meaning into this most basic tenant of law would undermine the whole judicial system.

### III.   FACTS

#### A. UNDERLYING CIVIL ACTION

The facts in the Underlying Action are in serious dispute and the testimony of all witnesses in the Underlying Criminal Action to which Malofiy was found ***Not Guilty*** contradict many if not all of Troiani's averments in the Underlying Action as to what really occurred that fateful night.

Nevertheless, in the Underlying Action, Troiani, alleges that he and the defendant, Malofiy, were patrons at Liberty Bar located at 2204 Market Street in Philadelphia, PA. *See Exhibit "B" at ¶15, 16.* While at Liberty Bar, the defendant, Malofiy, struck the Underlying Plaintiff with great force, with a beer glass, causing a severe blow to the head, face and causing severe injuries. S*ee Exhibit "B" at ¶20.* According to the Underlying Plaintiff, Malofiy's striking of Troiani was "without provocation of any kind." *See Exibit "B" at ¶33.*

According to Underlying Complaint, Malofiy struck Troiani in and about the face and body "willfully, recklessly, wantonly, outrageously, and unlawfully, and with the malicious intent to injure" the Underlying Plaintiff. *See Exhibit "B" at ¶31,* p. 15.  Additionally, according to the Underlying Plaintiff, the actions of the defendant, Malofiy, were done by "negligence, willful, wanton, reckless, outrageous, unlawful conduct, and disregard of the rights of the Plaintiff." *See Exhibit "B" at 34, 35, 36, 37, 38.*

As a result of the actions of the defendant, Malofiy, was arrested by the Philadelphia Police Department and charged with Aggravated Assault, Simple Assault, Recklessly Endangering Another Person, and Possession of an Instrument of Crime. *See Exhibit "B" at ¶21.*

#### A. UNDERLYING CRIMINAL ACTION

The Underlying Criminal Action was heard and tried before a 12 member jury before the Honorable Steven R. Geroff from August 12 - 19, 2010, in the Court of Common Pleas of Philadelphia. Defendant Malofiy was found *Not Guilty* on all charges. Self-defense is *not* an act intended to cause harm, but rather is an act intending to protect oneself from another's unlawful use of force. In this case, the jury found that Malofiy was justified in his use of force to protect himself and his girlfriend from *Troiani's unlawful use of force against Malofiy.*

Francis Malofiy was struck repeatedly by the Underlying Plaintiff before defendant Francis Malofiy struck the Underlying Plaintiff. The incident was captured on 16 surveillance video cameras and was viewed in its entirety by the jury. Defendant Francis Malofiy was tried by a 12 member jury of his peers (10 women and 2 men) and was unanimously found *Not Guilty* on *all* criminal charges brought against him in connection with the striking.

The record speaks for itself and the jury so too agreed:

**Malofiy on direct examination:**

Q.    While you were there with Ms. Gallagher, did something occur while you and Ms. Gallagher were there that caused you some concern?
A.    Yes, As I was walking back, I noticed three men who were highly intoxicated and who were acting drunk; were off balance.
Q.    While you two were waiting for your friends to return, did something occur while you were in the bar involving any other persons directed towards you and Ms. Gallagher?
A.    Right. I immediately noticed Mr. Troiani, and Mr. Troiani was acting belligerent. He was swaying quite a bit. He was causing a ruckus in the bar.
Q.    Stop a second. Did you ever know Mr. Troiani before that night?
A.    Never.
Q.    Did you ever know Mr. Viola before that night?
A.    Never.
Q.    Mr. Viscuso?
A.    Never.

***

Q.    Now, you had said before I diverted you that Mr. Troiani was acting belligerent and some other conclusions. I don't want conclusions. I want what you observed.
        What was he doing that caused you to reach that conclusion that he was acting belligerent?
A.    At first, they were pointing to the game on one of the screens behind us. Shortly thereafter, his attention turned towards me and Ms. Gallagher. They started to cup their

hands to their face and say pussy, cunt, faggot; and started to make derogatory comments to me and my girlfriend.

Q.      At some point, did that conduct escalate or did it stop for a period of time?

A.      No. It continued to escalate. These were comments made [from the side of] their mouths and then they were more brazen and directly pointed to me and my girlfriend.

Q.      In comparison to your size, how did you perceive the size of these individuals?

A.      They were all much larger than me, and much heavier.

***

Q.      As things escalated, did something occur that caused you to take some action in terms of staying or leaving?

A.      Initially my reaction was to just ignore them. I figured that to diffuse the situation, that would be best. I tried to ignore their conduct.

But as it became more egregious, they began to say things like, show us your tits, and began to make comments in reference to my girlfriend as a slut.

At that point, I felt very uncomfortable and I was scared.

Q.      Where were these three individuals standing in relationship to the table where you were, feet-wise from you?

A.      They were arm's length across. Probably about three feet.

Q.      At some point, did any of the three get closer to you and your lady friend, Ms. Gallagher?

A.      Yes, they did.

Q.      Do you know now which individual got closer?

A.      Mr. Troiani was the main aggressor. [However] it was Mr. Viscuso who was on it opposite side of him who started to come around to the back of where me and my girlfriend were standing.

Q.      What did Mr. Viscuso do, if anything, to you?

A.      Well, at first, I wasn't sure what his intentions or actions were; but as my attention was focused on Mr. Troiani because he was pointing there yelling things like faggot and cunt. Then he started pointing more and more towards me.

Eventually, at that point, I was about ready to leave. Then he came over, reached his hand over and he came up to my face like this (indicating), said, listen, it's cool, I'm being an asshole. It's cool, I'm being an asshole. It's cool, and I said, no, it's not cool at all.

Q.      Did you two have any contact with your hands at that point?

A.      Not at that point. Then he was saying, come on, I'm sorry, I was acting like a jerk-off. At that point, I just wanted to diffuse the situation, and I grabbed his hand and said, okay, it's over, forget it. And I shook his hand.

Q.      What happened after that moment of reconciliation took place?

A.      Immediately after that, more insults were being hurdled back and forth, and there was a person behind me who was saying things also derogatory.

At that point, I became very concerned. My girlfriend at that point said to me - - at this point, she said she was inappropriately touched and said she wanted to leave.

At that point, I was scared and very concerned for my safety and also the safety of my girlfriend, and I said, that's it, we're out of here; and I motioned to her on it.

***

Q.      After that did you make an effort to leave?

A.      Yes, I did.  As soon as my girlfriend had told me she was touched and she said she was scared, I said, that's it, we're going to leave.

        I motioned her on, asked her to follow me out.  As soon as that happened - -

***

Q.      As you started to leave, which direction were you going to leave?

A.      I was going to leave out the front door.

Q.      Where was Ms. Gallagher as you were making an effort to leave?

A.      When I motioned her on, she was right behind me.  She was following me out. All our drinks were left on the table.

Q.      Were you able to leave?

A.      I wasn't able to leave.  As soon as we attempted to leave and after she told me she was inappropriately touched, I said, we're leaving.

        At that point, Mr. Troiani came over, and right after he apologized, came over right in my face and said, fuck you, pussy, and started making comments like this in a real aggressive manner.

Q.      Was that while you were still standing at the table or after you had departed?

A.      This was right after his friend inappropriately touched my girlfriend.  Right after he supposedly made amends, I was walking to leave, and that's when he put it right in my face, his finger, and I had to lean back not to be hit.

Q.      After that occurred, did you continue your effort to walk out?

A.      Yes, I did.  I continued to.

Q.      Describe to the jury, what do you recall happened as you started to walk to the door with Ms. Gallagher in two?

A.      As I started to walk out.  I realized the whole situation was escalating.  I was scared and concerned.

        When I started to come around, Mr. Troiani then, after calling me a cunt and a pussy and putting his finger in my face, put his hand up to my head, to my bandana, and said, what's a dirty Spic like you doing with that white bitch?

Q.      Where were you standing at that point?

A.      At that point, I was standing coming right around and he put his hand up to my bandana, made reference to it and made that kind of statement towards me.

Q.      By the way, were you aware of any bar security that night when you were there?

A.      I was unaware of any bar security that night.

***

Q.      Mr. Malofiy, as you then approached to go down the aisle past the bar to the front door, what, if anything, happened per your recollection?

A.      Well, Mr. Troiani struck me twice right in my chest, took my wind out of me.  I was scared.

Q.      How did he hit you or strike you in the chest?

A.      With his fist like (indicating) twice like this and knocked my wind out because it hit my solar plexus.

Q.      What happened?  Did you go backwards?  Forwards?  Stay the same?

A.      Knocked me back and I started to move back and he started to block my exit path. When this happened, then Mr. Viscuso started to come into the picture and Mr. Viola started to back up their friend, Mr. Troiani.

At that point, Viscuso put down his beer, cupped his hands to his face and yelled, fight, one time; and immediately, he put his fist together like this (indicating), and all three of them started - - were coming at me with fists drawn.

Q.      How far was each person from you? Starting with Mr. Troiani at that point.

A.      Mr. Troiani was hitting me and blocking my pathway.

Q.      Mr. Viola?

A.      Mr. Viola was literally about this far away (indicating).

Q.      This far is what? A foot?

A.      Less than a foot.

Q.      Mr. Viscuso?

A.      Mr. Viscuso was also probably about a foot and a half; and originally, they were on the other side of the table. They all came together with their fists drawn.

Q.      How big was Mr. Viola, as you recall, that particular night?

A.      About 6'2". He's well-built, works out and is about 220 pounds.

Q.      At that point, what did you believe was going to happen to you?

A.      A fight was called. There was firsts in my face. I was already being struck multiple times. I was being called a cunt, a pussy, faggot, a Spic. My girlfriend was assaulted ans I was very scared.

Q.      Was she saying or doing anything as these events unfolded at that particular second, per your recollection?

A.      At that instant, when fight was yelled, when the fists were cocked coming right at my face, that happened, you have to understand (indicating) this fast and, at that point, she started screaming in the back.

Q.      Could you hear what she was screaming or you just heard her screaming?

A.      She was scared; just a girl's scream.

Q.      What did you try to do? Did you go backwards? Forward? What did you do?

A.      I tried to push – after being hit. I tried to push through at that moment.

When the fists kept on getting closer, literally, right on my face to strike, at that point, I was very scared and didn't know what to do and I just reacted in self-defense and punched Mr. Troiani in his face as hard as I could.

Q.      When you punched him, did you know whether you had anything in your hand?

A.      I didn't know I had anything. My intention wasn't to get into a fight. It was to leave.

Q.      Did you have something in your hand?

A.      After reviewing the video, yes, I did, I had something in my hand, a glass.

Q.      How many times did you hit Mr. Troiani?

A.      I struck him one time in the face.

Q.      And your reason for hitting him at that point was what?

A.      He had already hit me twice, blocked my exitway. I was scared for my safety and my girlfriend's safety, and his friends had just yelled fight and came up to me with fists drawn.

I thought I had no other option to get out, and I couldn't push through him.

Q.      After you hit him the one time, what did you do next, if anything?

A.      Grabbed his shirt immediately thereafter.

Q.      Why did you grab him as opposed to just walking ahead?

A.      Because I wanted to make a pathway.  I was trying to get just, you know, it's instinctive.  It happened all so fast.  I was just trying to push him out of the way to be able to walk by and, I guess, have Ms. Gallagher walk by too.

Q.      Did you have any sort of hold after you grabbed his shirt, that is, Mr. Troiani, any sort of hold after you grabbed his shirt?

A.      Immediately after I struck him, I grabbed his shirt.  Then I put him in a chokehold like this (indicating).

Q.      Did you realize that he had been cut at that point in time?

A.      No, I did not.

Q.      Did you realize something happened to you at that point in time when you attempted to put a chokehold on Mr. Troiani?

A.      Yes.  The first time that I realized something was amiss, besides being extremely scared and fearing for my safety, when I had come around Mr. Troiani, I attempted to put a chokehold on him and I felt my right bicep was like jelly.  I had no strength whatsoever.

        When I looked down, all I saw was blood, but I didn't know what the blood was from.  I didn't know if it was my hand or something else at that point because my body was in shock.

Q.      Did you know that you had a glass at the time of the impact on his face?

A.      No, I did not.

Q.      When you had him in a chokehold, did you have the glass or any part of the glass still in your hand, to your knowledge, as you sit here today?

A.      No, I did not.

Q.      At that time, did you attempt to grind or cut further his face while you had him in a choke hold?

A.      Absolutely not.

Q.      What happened after you grabbed him in a chokehold?  What was the next thing you know happened, if you can recall?

A.      I just recall us falling towards the bar sort of simultaneously as – there's a lot of commotion, and then we proceeded to leave.

Q.      When you left the bar, where did you go after you walked out of the – which way did you go when you walked out of the bar?

A.      Out the front door and then my friends were out front.  At that point, I said, call an ambulance, I'm bleeding really bad.

        At that point, my hand, I realized, was cut very bad through here (indicating);  and there was quite a bit of blood gushing out profusely.

Q.      Let's go back a second while you're still in the bar immediately before the strike.

        When you were approached, hit, as you described it to the jury, then the others came forward with fists, why didn't you run backwards or run to the exit at the rear?

A.      I didn't know there was an exit in the rear and it was so crowded in the back there as well.

Q.      Why didn't you call to the bartender or run to the bar at that point in time?

A.      Never did I imagine this would escalate to the point my path would be blocked.  I just was hoping to pass him, diffuse this and pass by these guys, if I could.

Q.      What did you think was going to happen to you if you hadn't struck the blow at that point attempting to leave?  What did you think was going to happen to you if you had just left your hands down or back up or stayed there?

        What did you think was going to happen based on your understanding at that instant time?

A.      All three of these guys were high, torqued, already drunk.  They already had struck me multiple times.  They yelled fight.  They threw their fists up in a fighting position and came at me.

At that point, I was left with no other option.  I was scared they were going to hit me if I didn't hit them first;  and at that point, it was just an issue of self-defense and protection of me and my girlfriend.

*See Transcript of the Criminal Trial marked as Exhibit "X" at pp. 183 – 203.*

### B.  THE INSURANCE POLICY

The plaintiff, Nationwide, issued to Alexander & Pauline R. Malofiy, the parents of the

defendant, Francis Malofiy, a Homeowner Policy of liability insurance, policy number 58 37 MP

187088, for the policy period July 17, 2008 to July 17, 2009.  *See Exhibit "C".*

The Homeowner Policy of insurance provides liability coverage as follows:

> ***Coverage Agreements***
> **Coverage E - PERSONAL LIABILITY**
> **We** will pay damages an **insured** is legally obligated to pay due to an **occurrence** resulting from negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property.  **We** will provide a defense at **our** expense by counsel of **our** choice.  **We** may investigate and settle any claim or suit.  **Our** duty to defend a claim or suit ends when the amount **we** pay for damages equals **our** limit of liability.
>
> This Coverage is excess over other valid and collectible insurance.  It does not apply to insurance written as excess over the applicable limits of liability.

*See Exhibit "C" at p. G1.*

The Homeowner Policy of liability insurance provides the following liability exclusions

as follows:

> ***Liability Exclusions***
>
> 1. Coverage E - Personal Liability and Coverage F – Medical Payments to Others do not apply to **bodily injury** or **property damage:**
>
> a) by an act intending to cause harm done by or at the direction of any **insured.** This exclusion does not apply to corporal punishment of pupils.

b) caused by or resulting from an act or omission which is criminal in nature and committed by an **insured.**
This exclusion 1.b) applies regardless of whether the **insured** is actually charged with, or convicted of a crime.

*See Exhibit "C" at p. H1.*

The Homeowner Policy of insurance provides the following relevant definitions:

1. "BODILY INJURY" means bodily harm, including resulting care, sickness or disease, loss of services or death. **Bodily injury** does not include emotional distress, mental anguish, humiliation, mental distress or injury, or any similar injury unless the direct result of bodily harm.

4. "OCCURRENCE" means **bodily injury** or **property damage** resulting from an accident, including continuous or repeated exposure to the same general condition. The **occurrence** must be during the policy period.

5. "INSURED" means **you** and the following persons if residents of **your** household at the **residence premises:**
    a) **your** relatives;

*See Exhibit "C" at p. G1.*

## IV.   ARGUMENT

The proper test to be applied in resolving these issues is a comparison of the four corners of the Underlying Complaint (accepting disputed facts in favor of the insured), and the insurance policy in question, while giving deference to the case law that has established the standards to which insurance policies must be read, interpreted, and applied.

### A.   DUTY TO DEFEND

Pennsylvania law requires that the insurer, Nationwide, has a duty to defend the insured, Malofiy, when the factual allegations underlying the complaint on their face state a claim against the insured to which the policy *potentially* applies. If the factual allegations in the Underlying

Complaint on their face state a claim against the insured to which the policy ***potentially*** applies, and therefore Nationwide ***must*** defend Malofiy.

In this matter, the plaintiff, Nationwide, seeks a declaration, that it has no obligation to defend and/or indemnify the defendant, Malofiy, under a policy of homeowners insurance issued to the parents of the defendant, Malofiy, in connection with the allegations in the Underlying Complaint. The Underlying Complaint was filed in the Court of Common Pleas of Philadelphia County as a *negligence* action. In the Underlying Complaint, it is alleged that the defendant, Malofiy, acted *negligently, carelessly, willfully, wantonly, recklessly, intentionally, and outrageously,* in striking the Underlying Plaintiff.

The plaintiff, Nationwide, contends that the allegations in the Underlying Complaint aver intentional conduct which does not qualify as an "occurrence" under the policy. Additionally, the plaintiff contends that the above exclusions apply because the defendant, Malofiy, is alleged to have acted intentionally, and, because, regardless of his intent, his act of striking the Underlying Plaintiff was criminal in nature, evidenced by the criminal charges brought against him.

Defendant, Malofiy, alleges that the Underlying Complaint is riddled with factually false and untrue statements and that most if not all the substantive statements in the Underlying Complaint are incorrect, untrue, are in dispute, or have been proven completely false by the sworn testimony of the involved parties (including Troiani), discovery, and evidence submitted.

Furthermore, the defendant, Malofiy, contends that the Underlying Complaint in essence is a pure *negligence* action and has been filed as such by the Underlying Plaintiff. The allegations in the Underlying Complaint aver that defendant acted *negligently, carelessly, willfully, wantonly, recklessly, intentionally, and outrageously.* Therefore because *negligence and carelessness* would qualify as an "occurrence" under the policy, then Pennsylvania law, which governs in this case, requires that "if the factual allegations underlying the complaint on

their face state a claim against the insured to which the policy *potentially* applies," then the insurer must defend. <u>State Farm Fire & Casualty Co. v. Butchin</u>, 1996 U.S. Dist. LEXIS 2886 (E.D. Pa. Mar. 12, 1996). <u>Pacific Indem. Co. v. Linn</u>, 590 F. Supp. 643, 646 (E.D. Pa. 1984) (emphasis added); <u>Brugnoli v. United National Ins. Co.</u>, 284 Pa. Super. 511, 426 A.2d 164, 166 (Pa. Super. 1981).

In a declaratory action already decided before this very court, with an analogous fact pattern, <u>State Farm v. Butchin</u>, the underlying plaintiff stated that she was invited to the home of the defendant and that without warning or provocation she was attacked and beaten by defendant … Hair was pulled, kicked, thrown to floor to left side of hallway.  Keys were thrown, hit my eye.  Pulled end of hallway toward steps.  Handbag thrown, hit my head.  Tore my shirt, was banging his bedroom door back and forth – the door fell into wall.  Struck leg with briefcase with enough force to cause a fracture, was thrown down steps." <u>State Farm Fire & Casualty Co. v.</u> <u>Butchin</u>, 1996 U.S. Dist. LEXIS 2886 (E.D. Pa. Mar. 12, 1996).

Similarly to the declaratory action before this court, the underlying defendant in <u>State</u> <u>Farm</u> asserted that the facts were quite different.  He maintained that the underlying plaintiff attempted to forcibly enter his bedroom and was told to leave his home but she used physical force to gain entry into his bedroom and in an attempt to stave off the underlying plaintiff's repeated thrusts and blows, he picked up his briefcase, which fell from his grasp and struck the underlying plaintiff and that he did not emerge from his bedroom until the underlying plaintiff was off of his property. *Id.*

The underlying complaint in the <u>State Farm</u> case stated the "incident resulted solely from the intentional, *careless, negligent,* and/or *reckless* acts of the defendant." (emphasis added). The court held that on its face, the complaint requires plaintiff to defend.  The court further went on to acknowledge that there is case law indicating that simply because the complaint states negligence, carelessness, and recklessness as bases, does not necessitate coverage. *See*

*Nationwide Mutual Ins. Co. v. Yaeger, No. 93-3024, 1994 U.S. Dist. LEXIS 11767* (E.D. Pa. Aug. 17, 1994); *State Farm Fire & Casualty Co. v. Griffin, et al., 903 F. Supp. 876,* slip op. (E.D. Pa. 1995). However the court made the distinction that these cases, are uniquely, cases in which subsequent discovery revealed no evidence of possible negligence as a cause of the injury and more importantly *no claim of self-defense.* The court then further explained in <u>State Farm</u> that the facts before the court indicate that self-defense and/or negligence are plausible defenses to the intentional claims here and that any injuries which may have occurred as a result of his protecting his person and also by his accidental dropping of the briefcase, which was, at worst, negligent. As such, the facts are clearly potentially within the scope of the policy, therefore, plaintiff must defend Schwartz." *Id.*

This very court in <u>State Farm</u> held that, "We find that plaintiff must defend [the underlying defendant] as his conduct is covered by the homeowners policy. Pennsylvania law, which governs in this case requires that 'if the factual allegations underlying the complaint on their face state a claim against the insured to which the policy *potentially* applies,' the insurer must defend." <u>State Farm Fire & Casualty Co. v. Butchin</u>, 1996 U.S. Dist. LEXIS 2886 (E.D. Pa. Mar. 12, 1996) citing <u>Pacific Indem. Co. v. Linn</u>, 590 F. Supp. 643, 646 (E.D. Pa. 1984) (emphasis added); <u>Brugnoli v. United National Ins. Co.</u>, 284 Pa. Super. 511, 426 A.2d 164, 166 (Pa. Super. 1981).

As applied to the instant declaratory action, the <u>State Farm</u> case had an analogous fact pattern whereby the averments in the underlying complaint stated that the underlying defendant acted *negligently and intentionally*; and testimony of the underlying plaintiff and the underlying defendant were heavily in dispute; and where the underlying defendant had also asserted that his actions were in self-defense and that the striking with the briefcase causing the fracture to the underlying plaintiff was accidental or unintentional which the court deemed would be defined as an accident under the policy to which the insurance company would have to defend, even with

the similar exclusions to the insurance policy of intended harm and intentional or malicious

intent.

Malofiy testified that the second before the fight he and his girlfriend were violently

attacked – without provocation - by three highly intoxicated men, one of them being Troaini, and

Malofiy testified to the following of what had happened the split-second before the fight.

**Malofiy testimony:**
A.      At that point, I became very concerned.  My girlfriend at that point said to me - - at this point, she said she was inappropriately touched and said she wanted to leave.
        At that point, I was scared and very concerned for my safety and also the safety of my girlfriend, and I said, that's it, we're out of here;  and I motioned to her on it.

\*\*\*

Q.      Describe to the jury, what do you recall happened as you started to walk to the door with Ms. Gallagher in two?
A.      As I started to walk out.  I realized the whole situation was escalating.  I was scared and concerned.
        When I started to come around, Mr. Troiani then, after calling me a cunt and a pussy and putting his finger in my face, put his hand up to my head, to my bandana, and said, what's a dirty Spic like you doing with that white bitch?
Q.      Where were you standing at that point?
A.      At that point, I was standing coming right around and he put his hand up to my bandana, made reference to it and made that kind of statement towards me.
Q.      By the way, were you aware of any bar security that night when you were there?
A.      I was unaware of any bar security that night.

\*\*\*

A.      A fight was called.  There was fists in my face.  I was already being struck multiple times.  I was being called a cunt, a pussy, faggot, a Spic.  My girlfriend was assaulted and I was very scared.
Q.      Was she saying or doing anything as these events unfolded at that particular second, per your recollection?
A.      At that instant, when fight was yelled, when the fists were cocked coming right at my face, that happened, you have to understand (indicating) this fast and, at that point, she started screaming in the back.
Q.      Could you hear what she was screaming or you just heard her screaming?
A.      She was scared; just a girl's scream.
Q.      What did you try to do?  Did you go backwards?  Forward?  What did you do?
A.      I tried to push – after being hit.  I tried to push through at that moment.
        When the fists kept on getting closer, literally, right on my face to strike, at that point, I was very scared and didn't know what to do and I just reacted in self-defense and punched Mr. Troiani in his face as hard as I could.
Q.      When you punched him, did you know whether you had anything in your hand?

A.      I didn't know I had anything.  My intention wasn't to get into a fight.  It was to
leave.
Q.      Did you have something in your hand?
A.      After reviewing the video, yes, I did, I had something in my hand, a glass.
Q.      How many times did you hit Mr. Troiani?
A.      I struck him one time in the face.

*See Transcript of the Criminal Trial marked as Exhibit "X" at pp. 183 – 203.*

As applied to the instant declaratory action, Troiani's Underlying Complaint alleged that

the defendant, Malofiy, acted *negligently, carelessly, willfully, wantonly, recklessly,*

*intentionally, and outrageously,* in striking the Underlying Plaintiff.  Troiani's averments of what

had occurred are in great dispute to what Malofiy had testified to under oath.  Defendant, Francis

Malofiy, disputes the facts in the Underlying Complaint.  Courts have consistently held that

when there is a dispute over the facts then "inferences should be drawn in the light most

favorable to the non-moving party (insured), and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bell Tel. Co.,

24 F.3d 508, 512 (3d Cir. Pa. 1994).

Additionally, and similarly to the State Farm case Malofiy has alleged self-defense in his

actions and in fact a jury had found him *Not Guilty* of the charges that were brought against him

and that his actions were a justified use of force in self-defense against *Troiani's unlawful use of*

*force against Malofiy.*  Furthermore, Malofiy testified that he did not know that he had anything

in his hand when he struck Troiani, that it happened so fast and that it was instinctive and

reactionary to having three men violently attack him and that his actions were *not intentional* but

rather *reactionary and instinctive* and the his only intent was that to leave the establishment and

when that was made impossible, he used self-defense to protect himself and his girlfriend.

Malofiy did not reach for a glass, or pick up a glass, or brandish a glass with the threat of using

it.  The glass was in his hand as he held his drink, and when he was attacked he reacted and

instinctively made a fist and struck Troiani in self-defense to protect himself.  In doing so,

Malofiy sustained severe and permanent injuries to his right hand including severing his nerves and muscles and requiring immediate medical attention and hospitalization and subsequent surgeries. Malofiy testified that he was unaware he had anything in his hand when he struck Troiani and based upon the severe injuries he also sustained to his hand, it would be reasonable to believe or to infer that striking Troiani *with the glass* was an accident as he was unaware it was in his hand at the instant he reacted to the violent assault and threw his punch in self-defense.

In Utica v. Maclean this court found that an insurer must, however, defend its insured if the facts in the complaint "state[] a claim to which the policy *potentially* applies." D'Auria v. Zurich Ins. Co., 352 Pa. Super. 231, 507 A.2d 857, 859 (Pa. Super. 1986) (emphasis in original). See also Pipher, 140 F.3d at 225. This is true even if the facts "are completely groundless, false or fraudulent." D'Auria, 507 A.2d at 859, quoted in, e.g., Humphreys v. Niagara Fire Ins. Co., 404 Pa. Super. 347, 590 A.2d 1267, 1271 (Pa. Super. 1991). Therefore, if the facts alleged in the complaint, read broadly, state a claim that insured's policy could cover, the insurer has a duty to defend the insured. Utica First Ins. Co. v. Maclean, 2009 U.S. Dist. LEXIS 12774 (E.D. Pa. Feb. 19, 2009).

In Penn National v. Johnson the insured got into a physical confrontation with the decedent. Decedent then struck the insured. Decedent held a handgun, which fell from his grip. The insured grabbed the handgun, and had an opportunity to leave, but did not do so. The handgun accidentally fired into decedent's shoulder. Subsequent shots fired in rapid succession then struck decedent. The insured then fled. Decedent soon died. The insured was charged with several offenses, but pled guilty to voluntary manslaughter. He stated that the shooting was accidental. He received a 5- to 10-year prison sentence although he could had been sentenced to life on the original charges. The assignee sued him for negligence. The insured asked the insurance company to defend and indemnify him, but after a cursory and inadequate

investigation, it declined to do so.  The insurance company sought a declaration that it did not have a duty to defend and indemnify for what it concluded was an "intentional" shooting.  The trial court found that the insurance company did have a duty to defend and indemnify *because it was at least arguable* that the shooting was merely negligent and that its denial of that duty was in bad faith.

The court in <u>Penn National</u> awarded in favor of the Declaratory Judgment Defendant and against the Declaratory Judgment Plaintiff, Penn National, on claims sounding in Breach of Contract, the sum of $ 2,490,666.00 in compensatory damages and, for denial in bad faith of coverage to its insured, legal interest thereon, and the sum of $6,000,000.00 (Six Million Dollars) in punitive damages, plus court costs and attorney fees. <u>Pa. Nat'l Mut. Cas. Ins. Co. v. Johnson,</u> 2007 Pa. Dist. & Cnty. Dec. LEXIS 123 (Pa. County Ct. 2007).

Nationwide has a duty to defend and indemnify Malofiy because the factual allegations in the Underlying Complaint on their face state a claim against the insured to which the policy *potentially* applies.  If the factual allegations in the Underlying Complaint on their face state a claim against the insured to which the policy *potentially* applies, the insurer *must* defend.

## B.     INTENDED HARM EXCLUSION

The policy exclusion 1a which removes coverage for bodily injury caused by an act intending to cause harm done at the direction an any insured is *not applicable* because Malofiy's *act was self-defense intended for protection against Troiani's unlawful use of force.*

**Malofiy testimony:**
A.      Never did I imagine this would escalate to the point my path would be blocked._ I just was hoping to pass him, diffuse this and pass by these guys, if I could.
Q.      What did you think was going to happen to you if you hadn't struck the blow at that point attempting to leave?  What did you think was going to happen to you if you had just left your hands down or back up or stayed there?
        What did you think was going to happen based on your understanding at that instant time?

A.      All three of these guys were high, torqued, already drunk.  They already had
struck me multiple times.  They yelled fight.  They threw their fists up in a fighting
position and came at me.
         At that point, I was left with no other option.  I was scared they were going to hit
me if I didn't hit them first;  and at that point, it was just an issue of self-defense and
protection of me and my girlfriend.

*See Transcript of the Criminal Trial marked as Exhibit "X" at pp. 183 – 203.*

Additionally, defendant Malofiy contends that he was acting in self-defense and that his

action in striking the Underlying Plaintiff was *reactionary* rather than *intentional* while he and

his attractive girlfriend were being violently physically attacked - without provocation of any

kind - by three men (including and predominantly by the Underlying Plaintiff).  Additionally, it

is defendant's position that he had no *intention to cause harm* to the Underlying Plaintiff.  In

fact, it was the Underlying Plaintiff along with a group of men acting in concert who intended to

cause harm and did in fact cause harm to Malofiy and his girlfriend by verbally assaulting and

violently physically attacking the defendant and causing him to suffer severe and permanent

injuries.

As a matter of law, self-defense is not an act intended to cause harm, but rather is an act

intending to protect oneself from another's unlawful use of force.  Malofiy testified that, "My

intention wasn't to get into a fight.  It was to leave." *See Exhibit "X".*

In Travelers v. Ward this court adjudicated a declaratory action where the insurer

attempted to deny coverage to the insured based upon a similar intended harm exclusion.  The

bare facts as follows, the insured *threw a woman in a shallow pool and broke her arm.*  In

Travelers the court determined that it was not certain that the intent of the action was to harm the

guest, the insurance company had a duty to defend the insured.  Here, the insurance company

still had the duty to defend.  Travelers Indem. Co. v. Ward, 2002 U.S. Dist. LEXIS 17898 (E.D.

Pa. Sept. 20, 2002).  As applied to the instant matter, in the Underlying Action the defendant was

simply reacting instinctively to being attacked by three drunken men and used force not with the intention to harm but with the intention to protect himself and his girlfriend.

The record is clear that Malofiy's intention was not to do harm but to leave and only when that option was prevented by the blocking of the exit by Troiani and his friends and only when he was violently attacked by all three men, fists drawn, did he then to use force in self-defense.

The policy exclusion 1a which removes coverage for bodily injury caused by an act intending to cause harm done at the direction an any insured is *not applicable* because Malofiy's *act was self-defense intended for protection against Troaini's unlawful use of force.* Therefore, Nationwide has a duty to defend and indemnify Malofiy because this exclusion is inapplicable.

### C.    CRIMINAL ACTS EXCLUSION

The policy exclusion 1b is *not applicable* which removes coverage for bodily injury caused by an act that is criminal in nature because Malofiy *was tried and found not guilty on all charges and the jury found his actions to be justified and in self-defense.*

Criminal by its very definition means one who has committed a criminal offense;  one who has been convicted of a crime;  or having the character of a crime.  When a defendant's use of force is justified in self-protection and when he is found not guilty of the crimes charged, it means that he is innocent and has committed no crime, and therefore his conduct cannot be deemed to be, or characterized as "criminal in nature."  To read or find any other meaning into this most basic tenant of law would undermine the whole judicial system.

Use of force is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.  See 18 Pa.C.S.A. § 505 – **Use of force in self-protection.**

Furthermore, at all times Malofiy has maintained his innocence and has stated with

clarity and without contradiction or impeachment the events as they had occurred that evening.

Malofiy's lady friend, Ms. Gallagher, along with those who testified at the underlying criminal

trial, including doctors who pronounced Troiani to be highly drunk, and including neutral eye-

witnesses to the event, only further corroborated and confirmed the testimony and the events as

Malofiy had always maintained. Troaini's testimony was preposterously impeached; throughout

the proceedings he had difficulty in maintaining his recollection of the events and his candor was

apparent. The altercation between Troiani and Malofiy was captured on 16 surveillance video

cameras and was viewed in its entirety by the jury. Defendant Malofiy was tried by a 12

member jury of his peers (10 women and 2 men) and was unanimously found *Not Guilty* on *all*

criminal charges brought against him in connection with the striking. Therefore, defendant

Francis Malofiy's action and conduct in connection to the striking can not *in any way* be deemed

or characterized as criminal. This is factually, and legally 100% incorrect and borders on slander

and libel.

The policy exclusion 1b is *not applicable* which removes coverage for bodily injury

caused by an act that is criminal in nature because Malofiy *was tried and found Not Guilty on all*

*charges and the jury found his actions to be justified and in self-defense.* Therefore, Nationwide

has a duty to defend and indemnify Malofiy because policy exclusion 1b is inapplicable.

## V.    RELIEF

For the aforementioned reasons, it is respectfully requested that the Court enter an Order

declaring that the plaintiff, Nationwide Mutual Fire Insurance Company, has an obligation to

provide a defense and indemnity coverage to the defendant, Francis Malofiy, in connection with

the Underlying Action, attorneys' fees, and costs, and whatever other relief this Court may deem

appropriate.

*****

**Respectfully submitted,**
**FRANCIS ALEXANDER, LLC**
<u>s/  Francis Malofiy</u>
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road
Media, PA 19063
Tel.:  (215) 500-1000
Fax:  (215) 500-1005
            *Law Firm / Attorney*
<u>December 15, 2010</u>
DATED


<u>s/ Samuel C. Stretton</u>
Samuel C. Stretton, Esquire
The Law Office of Samuel C. Stretton
301 South High Street
P.O. Box 3231
West Chester, PA  19381-3231
(610) 696-4243
(610) 696-2919 – Fax
Attorney I.D. No.:  18491
<u>December 20, 2010</u>
DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONWIDE MUTUAL FIRE          :  CIVIL ACTION NO. 10-2410
INSURANCE CO.,                  :
                     PLAINTIFF  :
                                :
              V.                :
                                :
FRANCIS MALOFIY,                :
                     DEFENDANT  :

## CERTIFICATE OF SERVICE

I hereby certify I am this date serving a copy of the

Defendant's Memorandum of Law in Support of Answer to

Plaintiff's Motion on the Pleadings in the captioned matter upon

the following persons in the manner indicated below.

Service by First Class Mail addressed as follows:

1.    Michael A. Cognetti, Esquire
      Swartz, Campbell, LLC.
      Two Liberty Place, 28th Floor
      50 South 16th Street
      Philadelphia, PA  19102
      (215) 564-5190
      Attorney for Plaintiff,
      Nationwide Mutual Fire Insurance Company

2.    Jordan S. Derringer, Esquire
      Swartz, Campbell, LLC.
      Two Liberty Place, 28th Floor
      50 South 16th Street
      Philadelphia, PA  19102
      (215) 564-5190
      Attorney for Plaintiff,
      Nationwide Mutual Fire Insurance Company

2.   Francis Malofiy
     1253 Hunt Club Lane
     Media, PA  19063

                    Respectfully submitted,


December 21, 2010            s/Samuel C. Stretton
            Date            Samuel C. Stretton, Esquire
                            Attorney for Defendant,
                             Francis Malofiy
                            301 South High Street
                            P.O. Box 3231
                            West Chester, PA  19381-3231
                            (610) 696-4243
                            Attorney I.D. No. 18491